**In the United States District Court**

**for the District of Kansas**

---

**United States of America**,

      Plaintiff,

v.

Case No. **5:24-CR-40040-TC**

**Douglas Harpster**,

      Defendant.

---

**Sentencing Memorandum**

---

The Court should sentence Douglas Harpster to 48 months in custody to promote rehabilitation, recognize the unusually minimal risk that he recidivates, and to avoid unwarranted sentencing disparities.

### 1.  Doug's history and characteristics.

Doug and his two brothers enjoyed a happy, supportive upbringing in rural Nebraska. His father worked on the county road crew, and his mother was an office manager. Doug's parents took "great" care of him, providing necessities and emphasizing education. Doug played basketball and was a member of the school band prior to his graduation from high school.

After high school, Doug moved to Salina to attend college. He wasn't ready; Doug would play pinball all night instead of studying. Though he completed additional online courses through Fort Hays State University, Doug decided it was time to go to work. He found employment at Nex-Tec in Salina, where he worked for more than twenty years, culminating with the title of systems

administrator. After his home was raided, Doug's employment at Nex-Tec ended, but he found another position with Sunbelt Solomon where he worked until he was remanded to custody after his guilty plea.

While Doug was building his career, he met and fell in love with his future wife, Cari. They bought a lovely old house on a tree-lined street in Salina which they shared with their two miniature dachshunds. Doug and Cari tried their hand at opening a bar in downtown Salina, but the venture was risky enough that Doug kept his day job. Cari sought medical training and now works as an infectious disease nurse.

Doug is fortunate for the strong relationships he has built with those close to him. In this exceptionally difficult time, Doug has relied heavily on, and is truly grateful for, the support of his wife, parents, brothers, and most of his friends. He understands that many people pleading guilty to possessing child pornography are excised from polite society, including by their families and friends. While the conversations with his family and friends about his crime have been heartrending, Doug is profoundly thankful for the profound support.

### 2. The crime.

Even those who knew them well must have believed that Doug and Cari were living a happy Midwestern life: good careers, nice house, two dogs. But all along, Doug had a secret; he was addicted to internet pornography. As Doug told the investigators, he had been using internet pornography since he was in college. The depth of the problem is apparent from Doug's statement to law enforcement right after the raid that, even likely facing child pornography charges, "what's foremost on my mind, how am I going to work without my phone, my computer, I can't function well without electronics." (PSR ¶ 24).

Neuroscience helps explain Doug's descent into the rabbit hole of online pornography, and eventually child pornography, in two ways. First, devotion to internet pornography is an addiction, just like devotion to methamphetamine. Using copious amounts of internet pornography rewires and remaps the brain in the same way a drug addiction does, compromising executive function and decision-making capacity. Second, swimming in an ocean of internet pornography builds a tolerance to mainstream pornography, goading users to seek taboo material like child pornography because frequent viewers of internet pornography require greater visual stimulation to evoke brain responses comparable to control subjects.

A "sexual compulsion can cause physical, anatomic change in the brain, the hallmark of brain addiction."[1] These "brain changes observed in addicts have been linked with patients with hypersexual behavior or pornography users through approximately 40 studies of different types: magnetic resonance imaging, electroencephalography (EEG), neuroendocrine, and neuropsychological."[2] These studies conclude that "a sexual compulsion can cause physical, anatomic change in the brain, the hallmark of brain addiction."[3]

These changes interrupt the brain's executive function. Research "into the brains of internet pornography users indicates that internet pornography undermines neural executive function, causing impulsivity, cognitive rigidity that impedes learning processes or the ability to shift attention, poor judgment and decision making, interference of working memory capacity,

---

[1] Hilton and Watts, *Pornography Addiction: A Neuroscience Perspective*, 2 Surg. Neurol Intl 19 (2011); Love *et al.*, *Neuoscience of Internet Pornography Addiction: A Review and Update*, 5 Behavioral Sciences 388 (2015) ("Regarding Internet addiction, neuroscientific research supports the assumption that underlying neural processes are similar to substance addiction.").

[2] de Alarcon *et al.*, *Online Porn Addiction: What We Know and What We Don't- A Systematic Review*, 8 J. Clin. Med. 91 (2019); Olson, *Natural Rewards, Neuroplasticity, and Non-Drug Addictions*, 61 Neuropharmacology 1109 (December 2011) ("sexual experience can alter dendritic morphology in a manner analogous to repeated drug exposure").

[3] Hilton and Watts, *Pornography Addiction: A Neuroscience Perspective*, 2 Surg. Neurol Intl 19 (2011).

deficits in emotion regulation, and excessive preoccupation with sex."[4] The impact is significant; the "effects of internet pornography addiction on brain functional connectivity in the prefrontal lobe exhibit characteristics similar to those of drug addiction[.]"[5]

An internet pornography addiction also remaps the brain in a way that causes the addict to seek more graphic material. The "previously established brain maps for 'natural' sexuality cannot compare to the newly developed and continuously reinforced maps generated by continued compulsive watching of Internet pornography, and thus the addicted individual progresses to more explicit and graphic Internet pornography in order to maintain the higher level of excitement."[6] Put another way, "frequent viewers of internet pornography require greater visual stimulation to evoke brain responses comparable to healthy controls or moderate porn users."[7]

The foregoing may be more explanatory than mitigating. But for defendants like Doug, who began with an internet pornography addiction and ended with a child pornography conviction, the science is important. It explains why Doug's guardrails went down; immersing himself in internet pornography literally altered his brain and disrupted his prefrontal cortex, causing impulsivity, poor judgment, and poor decision-making. Further, the neural rewards for

---

[4] de Alarcon *et al.*, *Online Porn Addiction: What We Know and What We Don't- A Systematic Review*, 8 J. Clin. Med. 91 (2019).

[5] Shu *et al.*, *The Impact of Internet Pornography on Brain Function: A Functional Near-Infared Spectroscopy Study*, Frontiers in Human Neuroscience (April 16, 2025) ("the functional connectivity in the prefrontal cortex with internet pornography addiction and drug addiction exhibits similar features. Moreover, the functional connectivity patterns in the brain's cortex with internet pornography addiction are strikingly similar to those observed in schizophrenia."); Kampa *et al.*, *Persistent Appetitive Memory in Problematic Pornography Users*, 15 J. Behav. Addictions 445 (March 2026) ("problematic pornography use should be considered a behavioral addiction").

[6] Love *et al.*, *Neuoscience of Internet Pornography Addiction: A Review and Update*, 5 Behavioral Sciences 388 (2015).

[7] *Id.*; de Alarcon *et al.*, *Online Porn Addiction: What We Know and What We Don't- A Systematic Review*, 8 J. Clin. Med. 91 (2019) (Repeatedly viewing pornography "results in a dysfunctional enhanced preference for sexual novelty, which may manifest as attempts to overcome said habituation and desensitization through the search for more (new) pornography as a means of sexual satisfaction".).

watching pornography eventually fade, prodding the user to seek out more explicit and graphic images to achieve the same effect.

### 3.   A below-guideline sentence would promote rehabilitation.

After law enforcement raided Doug's house on February 8, 2023, and well before he met counsel, Doug voluntarily entered sex offender treatment. The program is confidential, so Doug cannot name the group or where it meets. But he will explain to the Court the lessons that he learned in treatment, and how he has applied those lessons so far.

The Court should factor Doug's ongoing rehabilitation into its sentencing decision, because sex offender treatment works. Research, especially concerning cognitive-behavioral treatment programs, "strongly suggest[s] that treatment decreases recidivism of sexual crimes."[8] A high-quality study demonstrates that sex offender treatment using cognitive behavioral therapy can cut recidivism rates by almost half.[9] The Bureau of Prisons stands ready to provide Doug with that treatment.[10] Given that Doug started the treatment process on his own and seeks additional treatment, the Court should consider a sentence below the guideline range to facilitate rehabilitation.

### 4.   A guideline sentence is unnecessary to protect the public from Doug.

---

[8] Grossman *et al.*, *Are Sex Offenders Treatable? A Research Overview*, 50 Psychiatric Services (March 1999) (Noting a study in which sex offender treatment led "to a decrease in recidivism from a baseline rate of 27 percent in untreated individuals to a rate of 19 percent in patients who receive treatment.").

[9] Przybylski, Sex Offender Management Assessment and Planning Initiative, *The Effectiveness of Treatment for Adult Sexual Offenders* (July 2015) ("treated sex offenders had a significantly lower rate of recidivism than untreated sex offenders: 12 percent compared to 22 percent. In one analysis based on only the highest quality studies, MacKenzie found that cognitive-behavioral/ relapse prevention treatment, behavioral treatment, and hormonal medication significantly reduced sexual recidivism.").

[10] Federal Bureau of Prisons, Sex Offenders, https://www.bop.gov/inmates/custody _and_care/sex_offenders.jsp ("Institutional assignment, unit management, Psychology Treatment Programs, and re-entry planning promote the well-being of sex offenders while incarcerated and help both the offenders and society by reducing the likelihood of re-offence after release.").

We've long made wrongheaded assumptions about the recidivism rates of people convicted of a sexual offense. As the 21st century dawned, "there was a consensus that sexual recidivism, despite its methodological shortcomings, was a necessary and almost inescapable measure."[11] This "consensus was accompanied by the belief that researchers had a good idea of what sexual recidivism rates *should* look like, although there had not been any improvements or innovations regarding measurement."[12] But this "paradigm faced serious criticism for its portrayal of all individuals convicted of sex crimes as having fixed and continuing propensities to commit sexual offenses, particularly given the relatively low recidivism rates reported in numerous studies."[13] In fact, "sexual recidivism rates are not just relatively low but some of the lowest across types of crime.".

So too here. A guideline sentence is unnecessary to protect the public from Mr. Harpster, who is statistically likely to recidivate at about half the national average. The recidivism rate for all federal offenders is 49.3%.[14] A Commission study of offenders sentenced under USSG § 2G2.2 documented a recidivism rate of only 27.6%.[15] Put another way, 72.4% of people sentenced under § 2G2.2 never recidivate at all.

---

[11] Lussier *et* al., *Sex Offender Recidivism" Some Lessons Learned from Over 70 Years of Research*, 49 Criminal Justice Review 413 (2024) (internal quotation marks omitted); Duwe and Goldman, *The Impact of Prison-Based Treatment on Sex Offender Recidivism*, 3 Sex Abuse: A Journal of Research and Treatment 279 (2009) ("participating in treatment significantly reduced the hazard ratio for rearrest by 27 percent for sexual recidivism, 18 percent for violent recidivism, and 12 percent for general recidivism. These findings are consistent with the growing body of research that supports the effectiveness of cognitive behavioral treatment for sex offenders.").

[12] *Id.* ("The field of sexual recidivism research has been built on shaky grounds. Against the backdrop of evolution marked by issues and challenges as well as innovation and progress, researchers are still faced with some of the issues and dilemmas that were being raised 7 decades ago.").

[13] *Id.*

[14] United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016).

[15] *Id.* at 65.



Even that 27.6% recidivism rate is largely driven by minor offenses. Of the 1093 offenders studied, 302 recidivated.[16] The most common variety of recidivating offense was an administration of justice offense, which includes things like contempt of court and failure to appear. 179 of the 302 people who recidivated committed an administration of justice offense.[17] Another 88 committed a registration offense, meaning that 267 of the 302 offenders studied

---

[16] *Id*. at 65; n. 145 ("Administration of justice offenses include contempt of court, failure to appear, obstruction of justice, escape, prison contraband, and probation and parole violations (excluding failure to register as a sex offender).

[17] *Id*.

recidivated by committing a process crime. "Although occurring infrequently", 14 offenders (1.3%) committed a contact sex offense, and 36 (3.3%) committed a non-contact sex offense.[18]

There are risk factors that make recidivism more likely, but Doug doesn't exhibit any. Risk factors for recidivism after a sexual offense "include an individual's criminal history (e.g., prior conviction for any crime), past sexual offending (e.g., prior conviction for a sex crime), victim characteristics (e.g., male, less than 12 years old), mental health (e.g., personality disorder, psychopathy), and psychological, sexual, and social functioning (e.g., cognitive distortions supportive of rape and sexual assault[.]".[19] Doug has no criminal history, he has no history of sexual assault, he has not sexually assaulted a male, he is not psychopathic and has no personality disorders, and he has pro-social ties. He is vanishingly unlikely to reoffend.

Unlike Doug, many people sentenced under § 2G2.2 do pose a risk of recidivism per the studies cited above. In an analysis of FY2019 cases sentenced under § 2G2.2, the Commission sought to determine which percentage of cases involved aggravating conduct, which the Commission defined as "(1) contact sex offenses; (2) non-contact sex offenses; and (3) prior non-production child pornography offenses.[20] Almost half of the defendants sentenced under § 2G2.2 exhibited aggravated conduct.[21]

---

[18] *Id.*

[19] *Id.* (The "number of previous convictions for sexual offenses and the characteristics of those offenses (sex crime against a male victim, use of violence) are statistically predictive of sexual recidivism"); ("studies that involve factor analysis have consistently identified an "antisocial" component underlying the risk factors for sexual recidivism").

[20] 2021 Report at 40.

[21] *Id.* at 41.



Figure 17.
Aggravating Conduct Among §2G2.2 Offenders
*Fiscal Year 2019*

Of the studied defendants sentenced under § 2G2.2[22]:

- 29.3% had engaged in a contact sex offense with a minor

- 6.5% had produced child pornography

- 19.8% had committed a non-contact sex offense against a minor

Prior acts of this nature are precisely what science says might increase the chance of recidivism.

It's notable that Doug has no such history.

### 5.  A guideline sentence would result in unwarranted disparity.

Between 2019 and 2025, federal district courts sentenced about 75% of defendants to a

sentence within the federal sentencing guidelines. During the same period, federal district courts

---

[22] *Id.* at 42-43.

applying USSG § 2G2.2 imposed a downward variance in about 60% of cases, selecting a guideline sentence only about 40% of the time (the red dotted lines are variances).



A guideline sentence under 2G2.2, especially for Doug, is an unwarranted disparity. The Commission's research has revealed "significant sentencing disparities among similarly situated offenders as courts and the government contend with the outdated statutory and guideline structure."[23] The Court should sentence Doug below the guideline range to avoid that disparity.

It may or may not be enough to point to other defendants sentenced under the same guideline to establish that a particular sentence constitutes an unwarranted disparity. The Tenth Circuit has expressed a preference for "comparator cases involving similarly situated defendants".[24] We have that here; a Commission study has examined sentencing outcomes for defendants *identically situated* to Doug.

---

[23] 2021 Report at 69.
[24] *United States v. Hurst*, 94 F.4th 993, 1006 (10th Cir. 2024) ("As for Hurst's sentencing disparity argument, he points to no specific, comparator cases involving similarly situated defendants that would help establish that the district court failed to adequately consider, as outlined in § 3553(a)(6), the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.").

In the 2021 report, the Commission "compared offenders who received the same specific offense characteristics, and thus presumptively committed the offense in the same way, to analyze the degree to which courts imposed disparate sentences among similarly situated offenders."[25] The Commission identified 119 defendants who were sentenced in FY 2019 for possession of child pornography under § 2G2.2. The guideline calculations for those offenders were precisely identical to Doug's.[26]

|  | Base Level | 2G2.2(b)(2) (Under 12) | 2G2.2(b)(4) (Sadism) | 2G2.2(b)(6) (Computer) | 2G2.2(b)(7) (> 600) | 3E1.1 (AOR) | Level | Range |
|---|---|---|---|---|---|---|---|---|
| Study Cohort | 18 | Applied | Applied | Applied | Applied | Applied | 28 | 78-97 |
| Doug Harpster | 18 | Applied | Applied | Applied | Applied | Applied | 28 | 78-97 |

Why did 119 defendants with Doug's exact guideline calculation, which yields a range of 78-97 months, get an average sentence of 47 months? The Commission's answer is unwarranted sentencing disparity. The Commission found "considerable differences in how these similarly situated possession offenders were sentenced."[27] The average sentence for these 119 possession offenders was 47 months, with the overwhelming majority (81.5%) sentenced below the guideline range."[28]

---

[25] 2021 Report at 53.

[26] *Id.* at 54.

[27] *Id.* at 54.

[28] *Id.* at 54-55.

The fact that "sentencing disparities for similarly situated non-production child pornography offenders persist today"[29] should give the Court great pause before it imposes a guideline sentence in Doug's case. The 119 participants in the Commission study are surely at least substantially similar to Doug; each has precisely the same base offense level and series of adjustments, culminating in a final offense level of 28, a criminal history category of I, and a range of 78-97 months. Yet over 80% of the study defendants received a sentence below the guideline range, and those sentences averaged out to 47 months. To avoid unwarranted disparity, the Court must determine *why* Doug deserves to be sentenced within the guideline range when so many other defendants are not. That the guidelines recommend a sentence of 78-97 months is not enough, and nothing about this case dictates that Doug should receive a sentence 31 months higher than the study average, an increase of about 40%.

### 6. The available guideline is unhelpful.

§ 2G2.2 does little in helping the Court select a sentence commensurate with the § 3553(a) factors. Everyone hates § 2G2.2: the Sentencing Commission,[30] appellate courts,[31] district courts,[32]

---

[29] *Id*. at 53.

[30] United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 2021) (hereafter 2021 report) (Noting 2G2.2's "disproportionate emphasis on outdated measures of culpability").

[31] *United States v. Regan*, 627 F.3d 1348, 1354 (10th Cir. 2010) (describing the policy disagreement with § 2G2.2 as "quite forceful"); cautioning that "district courts should carefully apply the child pornography distribution guideline and remain mindful that they possess broad discretion in fashioning sentences under U.S.S.G. § 2G2.2." *United States v. Grigsby*, 749 F.3d 908, 911 (10th Cir. 2014) (same); *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) (finding within-guideline child-pornography sentence substantively unreasonable and describing § 2G2.2 as "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results"); *United States v. Grober*, 624 F.3d 592 (3d Cir. 2010) (affirming variance from child-pornography guideline where district court, after a careful analysis, concluded that § 2G2.2 "cannot be given deference and produces an unreasonable sentencing range even before considering the sentencing factors in [18 U.S.C.] § 3553(a)"); *United States v. Poulin*, 745 F.3d 796 (7th Cir. 2014) (remanding for resentencing where district court failed to adequately consider defendant's argument that § 2G2.2 is "extreme and unwarranted"); *United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011) (remanding for resentencing where unclear whether district court understood its discretion to vary from child-pornography guideline; noting that most of § 2G2.2's increasingly harsher provisions "were Congressionally-mandated and not the result of an empirical study").

[32] *United States v. Abraham*, 944 F.Supp.2d 723, 728 (D. Ne. 2013) (internal citations omitted) ("As numerous courts and commentators have explained, the child pornography Guidelines are by and large not the result of the Commission's

and the Department of Justice.[33] Most courts "believe §2G2.2 is generally too severe and does not appropriately measure offender culpability in the typical nonproduction child pornography case"[34], which is likely why courts vary downward in 60% of 2G2.2 cases, as compared to a 25% downward variance rate in all cases. This Court must fashion a sentence for Doug recognizing that under § 2G2.2 "sentencing disparities for similarly situated non-production child pornography offenders persist today."[35]

## Conclusion

A sentence of 48 months serves the purposes of § 3553(a), and is sufficient but not greater than necessary to punish Doug for his crime.

---

expertise, nor based on careful study and empirical data. Instead, § 2G2.2 is the result of 2 decades' worth of Congressional directives—at times actively opposed by the Commission—that have continually ratcheted up penalties and piled on enhancements."); *United States v. Rothwell*, 847 F.Supp.2d 1048, 1054 (E.D. Tn. 2012) ("Congressional engagement with child pornography laws over the past two decades has untethered punishment for child pornography from any empirical work done by the United States Sentencing Commission."); *United States v. Childs*, 976 F.Supp.2d 981, 982 (S.D. Ohio 2013) ("There is widespread agreement among judges, lawyers and legal scholars that the guidelines for child pornography offenses are seriously flawed."); United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses* at 11, n. 63 (December 2012) (hereinafter 2012 Report) Prepared Statement of U.S. Chief District Judge Casey Rodgers (Northern District of Florida), to the Commission at 3–4, 7, 17, 21–22, 29 (Feb. 15, 2012) ("There is a common sentiment among many trial judges that [§2G2.2] fail[s] to provide an appropriate baseline or starting point for child pornography offenses which, combined with numerous offense characteristics, restrictions on departures, and congressionally mandated provisions not fully supported by the Commission's empirical study, produce guideline ranges that are too high compared to the statutory range, particularly in the area of possession and receipt.").

[33] 2012 Report at xii ("A variety of stakeholders in the federal criminal justice system, including the Department of Justice, the defense bar, and many in the federal judiciary, are critical of the current non-production penalty scheme"); 2021 Report at 69 ("Judges have continued to sentence most non-production child pornography offenders below the guideline range, most often by imposing variances pursuant to their authority under 18 U.S.C. § 3553(a), but also increasingly at the request of the government. Furthermore, the government often limits the sentencing exposure of nonproduction child pornography offenders by reducing distribution and receipt charges, which carry mandatory minimum penalties of at least five years, to possession charges, which carry no mandatory minimum penalty.").

[34] 2021 Report at 21-22.

[35] *Id*. at 53.

Respectfully submitted,

s/Kirk C. Redmond

Kirk C. Redmond, #18914

Assistant Federal Public Defender

632 SW Van Buren, Suite 200

Topeka, Kansas 66603

Phone: (785) 232-9828

Fax: (785) 232-9886

Email: kirk_redmond@fd.org

**CERTIFICATE OF SERVICE**

I certify that on April 15, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all interested parties.

s/Kirk C. Redmond

Kirk C. Redmond, #18914